**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| FABRIZIO BIVONA,<br><br>        Plaintiff,<br><br>    v.<br><br>BOROUGH OF GIRARDVILLE<br>(GIRARDVILLE BOROUGH COUNCIL and<br>GIRARDVILLE POLICE COMMITTEE),<br>MAYOR JUDITH L. MEHLBAUM<br>(individually); EDWARD BURNS<br>(individually),<br>        Defendants. | CIVIL ACTION<br>NO. 23-2635 |

## CIVIL ACTION COMPLAINT

Plaintiff, Fabrizio Bivona by and through their attorneys, Derek Smith Law Group, PLLC, hereby files the following civil action complaint against Defendants, Borough of Girardville (the Girardville Borough Council and Girardville Police Committee), Mayor Judith L. Mehlbaum, and Edward Burns (collectively "Defendants") for violations of the Pennsylvania Whistleblower Law, 43 Pa.C.S. §§ 1421-1428 ("PWL") and for wrongful discharge in violation of public policy.

Plaintiff Fabrizio Bivona ("Mr. Bivona" or "Plaintiff") seeks actual damages, compensatory damages, punitive damages, back pay, front pay, reinstatement, attorneys' fees, litigation costs, pre-and-post-judgment interest, and an adjudication and declaration that Defendants' conduct as set forth herein was in violation of the Pennsylvania Whistleblower Law.

## PARTIES

1.      Plaintiff, Fabrizio Bivona is an adult male and resides in the Commonwealth of Pennsylvania with an address for purposes of service at 707 Rosewood Road East, East Stroudsburg, Pennsylvania 18302.

2.      Defendant, Borough of Girardville, is a government organization which is licensed to and regularly transacts business in the Commonwealth of Pennsylvania with offices for the purposes of correspondence at 4th B Street, Girardville Pennsylvania 17935.

3.      The Girardville Borough Council and Girardville Police Committee and its member are part of and employees of Defendant, Borough of Girardville.

4.      Defendant, Mayor Judith L. Mehlbaum is an adult female who resides in the commonwealth of Pennsylvania.

5.      Defendant, Edward Burns is an adult male who resides in the commonwealth of Pennsylvania.

6.      At all times material, Defendants were Plaintiff's employer.

7.      At all times material to this civil action, Defendants were recipients of public funding by and through the Commonwealth of Pennsylvania.

8.      Defendants were Plaintiff's "employer" as defined under the PWL.

9.      Plaintiff was Defendants' "employee" as defined under the PWL.

10.     At all relevant times, Defendants accepted, adopted, acquiesced, and/or otherwise was bound by the actions, omissions, and conduct of its owners, officers, managers, supervisors, employees and agents.

## NATURE OF THE CASE

11.     Plaintiff complains pursuant to 42 U.S.C. ¶ 1983 and the Pennsylvania Whistleblower Laws and seeks damages to redress injuries Plaintiff suffered as a result of Defendant's discrimination, harassment, retaliation and disparate treatment and hostile work environment.

## JURISDICTION AND VENUE

12.     The action involves a Questions of Federal Law under 42 U.S.C. ¶ 1983.

13.     The honorable Court also had supplemental jurisdiction over the Commonwealth Law Causes of Action and the PWL.

14.     Venue is proper in the Middle District of Pennsylvania as Plaintiff was employed by Defendant and worked in the Schuylkill County in the Commonwealth of Pennsylvania where the violations of Plaintiff's rights occurred.

## MATERIAL FACTS

15.     Plaintiff, Fabrizio Bivona began his employment for Defendant, Borough of Girardville on or around March 4, 2022 and continued his employment until Plaintiff was unlawfully terminated from his employment in violation of Plaintiff's rights afforded by the United States Constitution including but not limited to Plaintiff's right to due process under the Fifth and Fourteen Amendments to the United States Constitution.

16.     Defendants stated reason for Plaintiff's termination was pretextual and Plaintiff was terminated due to Plaintiff's refusal to violate the law by  misusing his authority granted to Plaintiff as a Girardville Borough Police officer.

17.     Defendants terminated  Plaintiff's employment by letter dated January 12, 2023. The letter did not provide Plaintiff with the reason for the termination.

18.     At no time did Plaintiff fail to perform his duties and responsibilities of employment.

19.     At no time did Plaintiff present with issues related to performance and Plaintiff satisfied the responsibilities of his employment with excellence and diligence.

20.     Plaintiff remained employed by Defendants for eight approximately (8) months and always performed his duties and responsibilities with excellence, diligence, and skill.

21.     Defendants intentionally and with willful disregard for the law violated Plaintiff's rights under the United States Constitution.

22.     Defendants also violated the Pennsylvania Whistle Blower law as Plaintiff was terminated after Plaintiff engaged in protected activity to report Defendants unlawful and wrongful conduct.

23.     Plaintiff, Fabrizio Bivona began his employment for Defendants on or around March 4, 2022, and from the inception of his employment, there were significant issues with the manner in which Defendants maintained the evidence room.

24.     When Plaintiff, Fabrizio Bivona refused to engage in illegal conduct, by unlawfully using his police authority to violate the constitutional rights of citizens of the Borough of Girardville, Defendants attempted to falsely blame the issues Defendants already had with the police evidence room on Plaintiff in order to justify an unlawful termination.

25.     Plaintiff was hired by Defendants on or around March 4 2022.

26.     The Borough of Girardville Police Department is overseen by the Mayor of the Borough of Girardville, Defendant, Mayor Judith L. Mehlbaum ("Mehlbaum" or "Defendants").

27.     Defendant, Mehlbaum hired Plaintiff, Binova on or around March 4, 2022.

28.    In Order to assign Fabrizio Bivona the position of Chief of Police/Officer in Charge of the Borough of Girardville Police Department, Defendant, Mayor Judith Mehlbaum had to provide notice to the certifying agency, the Pennsylvania State Police about Fabrizio Bivona's appointment.

29.    Mayor Judith Mehlbaum did put the Pennsylvania State Police on notice regarding her decision to assign the position of Chief of Police/Officer in Charge of the Borough of Girardville Police Department to Fabrizio Binova.

30.    Accordingly, on March 4, 2022, Chief Bivona received an email from Commonwealth of Pennsylvania certifying agency, Commonwealth of Pennsylvania, Municipal Police Officers' Education and Training Commission regarding his appointment to the position of Chief of Police/Officer in Charge of the Borough of Girardville Police Department.

31.    The email was sent March 4, 2022, and read:

"Congratulations on your appointment as Chief/Officer in Charge of the Girardville Boro Police Dept Police Department. I would like to take this opportunity to provide you with information concerning your responsibilities under Act 120 of 1974, The Municipal Police Education and Training Law, as well as offer support services available to you through the Municipal Police Officers' Education and Training Commission (MPOETC)."

32.    Defendant, Mehlbaum hired Plaintiff, Bivona as the Chief of Police/Officer in Charge of the Girardville Borough Police Department.

33.    On March 16, 2022, Defendant, Mayor Judith Mehlbaum handwrote a letter on Borough of Girardville Police Department letterhead. The letter read:

"To whom it may concern, Fabrizio Bivona has been sworn in as Officer in Charge/Chief for the Girardville Police Department. He has the authority to submit paperwork for the police department."

34.     The handwritten letter by Defendant, Mehlbaum was signed "Judith L. Mehlbaum, Mayor Girardville, PA."

35.     Accordingly, Plaintiff Fabrizio Bivona was sworn in as Chief of Police/Officer in Charge of the Borough of Girardville Police Department in March 2022.

36.     Fabrizio Bivona's appointment was expressly authorized by his supervisor, Mayor Judith L. Mehlbaum.

37.     Defendants expressly provided the position of Chief of Police to Plaintiff, Fabrizio Bivona and Plaintiff held that position until January 12, 2023, when Defendants unlawfully terminated Plaintiff's employment.

38.     Accordingly, Defendant, Mayor Judith L. Mehlbaum subjected Plaintiff to disparagement, ridicule, and injury, when Defendant, Mayor Judith L. Mehlbaum intentionally offered false information that she knew or should have known would be published about Fabrizio Bivona's appointment and position as Chief.

39.     On January 11, 2023, Defendant, Judith L. Mehlbaum intentionally provided false information to the Shenandoah Sentinel where Defendant, Mehlbaum was quoted with the front page Article's Title, "He was never chief:" Girardville fires officer-in-charge accused of misconduct.

40.     The article states: "He was never the chief," Mayor Judy Mehlbaum said after the meeting. Bivona has identified himself as Girardville's Chief of Police in multiple emails to the media.

41.     Indeed, Fabrizio Bivona was the Chief of Police from the date the position was assigned to Fabrizio Bivona in March 2022, until Fabrizio Bivona's unlawful termination on January 12, 2023.

42.     The false and intentionally misleading information provided by Defendant Mehlbaum has caused Plaintiff to suffer real damages.

43.     Defendant, Mehlbaum's false statement was published multiple times in articles including but not limited to the Republican Herald and Yahoo.com.   The Yahoo.com article reads:

> "…The officer was suspended again on Dec. 30, according to another letter from Day, over a number of allegations, including working when told not to work; filing citations against fellow officers while suspended; falsely representing himself as chief of police; and ignoring orders to turn in his badge, keys and other borough property. …"

44.     Defendants and Defendant, Judith L. Mehlbaum have intentionally made false statements, disparaging Fabrizio Bivona, which has caused Fabrizio Bivona to suffer damages including but not limited to ending Bivona's career in law enforcement.

45.     Due to the false statements made by Judith L. Mehlbaum, Fabrizio Bivona has been unable to secure reemployment as a police officer in the Commonwealth of Pennsylvania.

46.     Prior to the false and misleading statement by Defendant, Judith L. Mehlbaum, Fabrizio Bivona had enjoyed an nearly nineteen (19) year career as a police officer, beginning 2004, in the Borough of Hawley.

47.     Fabrizio Bivona worked as a Police Office in the Commonwealth of Pennsylvania from 2004 through January 12, 2023, earning accolades and recognition as a highly decorated officer.

48.     Defendants and Defendant, Judith L. Mehlbaum's intentionally false information ended Plaintiff's career and Plaintiff has been unable to secure reemployment

due to the false published statements of Judith L. Mehlbaum that Fabrizio Bivona falsely held himself out as the Chief of Police when "he was never Chief."

49.     Plaintiff held the position of Chief of Police from on or around March 4, 2022 until January 12, 2023, when Defendants illegally terminated Plaintiff's employment for Defendants in violation of Plaintiff's rights under the United States Constitution.

50.     Defendants' decision to subject Plaintiff to an adverse employment action by terminating Plaintiff's employment has caused Plaintiff to suffer significant damages including loss of pay and benefits.

51.     Prior to his employment for Defendants, Plaintiff worked in various capacities as a first responded including as a police officer, registered nurse, and paramedic.

52.     Defendants singled Plaintiff out for discipline including suspension without pay and termination in response to Plaintiff engaging in protected activity by reporting and exposing unlawful conduct including fraud and waste and unlawful conduct by the Mayor of Girardville, Defendant, Judith Mehlbaum.

53.     Plaintiff reported misconduct by other police officers within the Borough of Girardville Police Department.

54.     Plaintiff also refused to use his authority and police powers to subject citizens of the Borough of Girardville to unlawful violations of their rights afforded by the United States Constitution.

55.     Within the first two (2) months of Plaintiff's employment as Chief of Police/Officer in Charge of the Borough of Girardville Police Department, Fabrizio Bivona was sitting in his office when he was approached by Mayor Judith L. Mehlbaum.

56.     Judith L. Mehlbaum notified Chief Fabrizio Bivona that she had a problem with one of her neighbors, who lived across the street from the home of Judith Mehlbaum.

57.     Judith Mehlbaum described her neighbors as "meth heads" and Judith Mehlbaum instructed Fabrizio Bivona to "take care of that for me."

58.     Fabrizio Bivona asked  Judith Mehlbaum whether there was any indication that they were breaking the law and suggested that Judith Mehlbaum provide a written complaint like any other citizen of the Borough of Girardville who wanted to make a complaint about a neighbor.

59.     Judith Mehlbaum refused to make a written complaint and ordered Fabrizio Bivona to go to the home and use his police powers to harass her neighbors.

60.     Judith Mehlbaum stated that she wanted "them gone."

61.     Judith Mehlbaum called her neighbors "dirtbags"  and "white trash" and Judith Mehlbaum instructed Fabrizio Bivona to go to their home and "get rid of them."

62.     Fabrizio Bivona explained that he could not use the Borough of Girardville Police Department like a private security force for the Mayor of Girardville or for the Girardville Borough Council.

63.     Fabrizio Bivona explained that he could not go to the home of the Mayor's neighbor and harass them at the request of Judith Mehlbaum.

64.     Judith Mehlbaum expressed annoyance and made comments in front of Fabrizio Bivona including comments such as "this is what we pay you for" and "what are we paying you for?"

65.     Fabrizio Bivona stated that he could not act without a written complaint.  Judith L. Mehlbaum ended up filing a written complaint about a dog barking.

66.     Fabrizio Bivona responded to the complaint about the dog barking by going to the home of Judith Mehlbaum's neighbor and investigating the complaint.

67.     Upon arrival at the home, there was dog present, however, it was not barking or causing or creating any noise issue.  Moreover the dog was contained within an enclosure.

Accordingly, Fabrizio Bivona issued a verbal warning about the dog barking and left the home without issuing any citation.

68.    When Judith Mehlbaum followed up with Fabrizio Bivona about her neighbors, Fabrizio Bivona explained what had happened.  Fabrizio Bivona explained that there was no legal basis upon which to issue any criminal citation.

69.    Judith L. Mehlbaum was visibly annoyed and angry and made comments indicating that she did not think Fabrizio Bivona was doing his job.  She again made comments including, "what do we pay you for?"

70.    Judith L. Mehlbaum continued to make inappropriate requests of Fabrizio Bivona and other police officers of the Borough of Girardville Police Department, that the officers use their police powers to harassment and intimidate members of the community who Judith Mehlbaum personally considered undesirable.

71.    Judith Mehlbaum called these undesirable members of the community "druggies" and "trash" and "white trash" (when they were white).

72.    Judith Mehlbaum targeted certain members of the community based on race including Hispanic members of the community.

73.    When Fabrizio Bivona declined to permit the Borough of Girardville Police Department to be used as a personal security force for the Mayor of Girardville, Judith L. Mehlbaum went to one of the other officers, Jeremy Talanca.

74.    On or around May 9, 2022, Borough of Girardville Police Officer, Jeremy Talanca went to the home of Mayor Judith L. Mehlbaum's neighbor for no reason whatsoever.

75.    This was the same neighbor that Judith L. Mehlbaum tried to convince Fabrizio Bivona to visit and harass.  Fabrizio Bivona refused to do so and on May 9, 2022, Jeremy Talanca went to the home without any purpose.

76.     Jeremy Talanca had no warrant.

77.     Jeremy Talanca did not receive a call or complaint.

78.     Jeremy Talanca had no legitimate purpose to visit the home of the Mayor's neighbor that Sunday evening, during the Spring of 2022.

79.     Jeremy Talanca and Brandon Gonzalez approached the home with guns drawn.

80.     Jeremy Talanca and Brandon Gonzalez entered the home without warrant or invitation.

81.     Talanca proceeded to go through the hone with guns drawn.

82.     Meanwhile the home's residents were having a family gathering that Sunday evening.

83.     Grandparents, parents, and grandchildren were enjoying the evening by having a barbeque in the backyard.

84.     The family gathering was violently interrupted when one of the grandchildren informed her father that she thought she saw someone breaking into their home, inside.

85.     The father entered the home and was confronted by two uniformed men, guns drawn, in the father's own kitchen.

86.     The family joined the father and the armed men in the kitchen and the family began asking the two armed men why they were in their kitchen with handguns drawn.

87.     The two uniformed men, who were employees of the Borough of Girardville, and present at the request of Mayor Judith L. Mehlbaum, began making a series of excuses, all of which turned out to be false.

88.     The armed men claimed they had chased someone into the home.

89.     The armed men claimed they had responded to a 911 call.

90.    The armed men were not able to explain why they were in the home that Sunday evening.

91.    The family of the home filed multiple complaints which Judith L. Mehlbaum refused to investigate.

92.    Fabrizio Bivona engaged in protected activity after receiving one of the complaints, that was forwarded to Bivona by the Borough of Girardville Secretary.

93.    Fabrizio Bivona engaged in protected activity by filing a written complaint by email, explaining that Bivona had received and viewed the body cam footage, and concluded that the civil rights of the family were violated by Talanca and Gonzalez.

94.    Fabrizio Binova explained that the conduct of Talanca and Gonzalez constituted a significant constitutional violation and that these officers continued employed implicated a risk to the public.

95.    Judith Mehlbaum refused to consider Fabrizio Binova's reports.

96.    Judith Mehlbaum and Officer Talanca continued to use the powers of the Borough of Girardville Police Department to subject Borough of Girardville citizen to harassment based on the personal viewed of Judith Mehlbaum, thereafter.

97.    Defendants permitted Officer Jeremy Talanca to continue his employment even after it was reported by Plaintiff, Bivona that Officer Jeremy Talanca exercised undue force by violently entering the personal property of another Family in violation of the Family's constitutional rights.

98.    During another incident, Defendants violated the rights of a Hispanic family that lived on Main Street, and Defendants attempted to use code enforcement and zoning officers to harass the Hispanic family and push them out of town.

99. Talanca continued to harass members of the Hispanic family and reports began to surface regarding Talanca's conduct.

100. Mayor Judith Mehlbaum misused the Megan's list in violation of the laws of the Commonwealth of Pennsylvania and in violation to the terms and condition that Defendants, Girardville Police Department must agree to in order to access the information through the Pennsylvania State Police.

101. Fabrizio Bivona communicated a private citizen's complaint regarding the official misconduct by Officer Jeremy Talanca on or around July 28, 2022.

102. Chief of Police Fabrizio Bivona found the complaint credible, but still verified the information before recommending the arrest of Officer Talanca for criminal trespass and harassment in violation of the complainant's civil rights.

103. Then Chief of Police Fabrizio Bivona engaged in protected activity by reporting multiple issues that Chief Bivona observed regarding misconduct by Officer Talanca.

104. Judith Mehlbaum refused to consider any of Bivona's reports and acted to protect Talanca because Talanca was operating like Judith Mehlbaum's personal security force.

105. Talanca had agreed to take on requests to harass members of the community at the request of Judith Mehlbaum.

106. Chief Bivona concluded that Officer Talanca should be found in dereliction of duty, abandonment of post, misuse of department equipment, improper use of private vehicle, and reckless endangerment of children.

107. Chief Bivona also concluded that Officer Talanca misused borough vehicles and equipment.

108.    Chief Bivona also concluded that Officer Talanca was insubordinate and failed to fulfill his official police duties which led to multiple violations of the Girardville Borough Police department policies and procedures.

109.    One of the many issues reported by the then Chief of Police, Bivona was improper handling of evidence and digital data.

110.    Fabrizio Bivona brought these issues to his direct supervisor, Mayor Judith Mehlbaum, and Bivona engaged in protected activity by reporting issues related to unlawful and wrongful conduct within the Borough of Girardville Police Department.

111.    JNET is a computerized system and point of contact concerning all criminal history information accessed by JNET Criminal History users.

112.    JNET is designed for use by the criminal justice and law enforcement community only.

113.    JNET It is not intended for use or access by non-criminal justice agencies.

114.    Accordingly, the use of JNET is strictly limited to authorized use by licensed law enforcement agencies and personal use of the JNET system is not permitted.

115.    When the then Borough of Girardville Police Department, Chief Fabrizio Bivona went to Mayor Judith Mehlbaum regarding the wrongful conduct of one of his police officers, Mayor Judith Mehlbaum was already familiar with the issue and refused to take any disciplinary action whatsoever.

116.    Mayor Mehlbaum admitted to improperly possessing and accessing confidential, privileged and sensitive information, data, and documents in violation of JNET guidelines.

117.    Officer Jeremey Talanca provided Mayor Judith Mehlbaum with access to confidential, privileged, and sensitive information, data, and documents in violation of JNET guidelines.

118.    In looking into the incident regarding Officer Jeremy Talanca, Plaintiff discovered information that Plaintiff found relevant to Talanca's continued employment with Borough of Girardville Police Department.

119.    Chief Bivona concluded that this information should have disqualified Talanca from consideration for employment.

120.    Officer Jeremy Talanca had been criminally charged and accused of physically assaulting and causing serious bodily injury to a female, as part of a domestic dispute.

121.    Officer Jeremy Talanca had subsequently fled from the police prior to their investigation but was eventually charged for assault and other criminal violations in connection with this domestic issue.

122.    It appeared that Talanca was prohibited from functioning as a fully sworn police officer in Luzerne County and was scheduled to be placed on the "Brady List" for corrupt or discredited police officers.

123.    Talanca's employment with Sugar Notch Police Department ended when Talanca was relieved of duty as Police Chief secondary to verified and credible complaints of gross police misconduct.

124.    Former Sugar Notch Chief of Police Talanca was separated from the Sugar Notch police department amidst allegations that Talanca targeted a councilman Fiorucci in Sugar Notch and improperly charged him on two separate occasions.

125.    The charges were unsupported and eventually dismissed by the courts and the second set of charges had to be withdrawn as they were unsupportable and appeared to be false.

126.    Officer Talanca allegedly fabricated evidence and made false statements regarding a shootout that appeared to have been fabricated.

127. This information was communicated by Chief Fabrizio Bivona to Mayor Judith Mehlbaum.

128. Mayor Judith Mehlbaum, the borough council and the borough solicitor ignored Fabrizio Bivona's reports.

129. Defendants violated the laws of the Commonwealth and the approved official Girardville Borough Police Department Policies and Procedures.

130. Defendants impeded, and interfered in multiple ongoing criminal investigations and exposed their derogatory conduct against Chief Bivona.

131. Plaintiff was terminated thereafter on or around January 12, 2023.

132. Defendants terminated Plaintiff because Plaintiff refused to engage in police misconduct in violation of the civil rights of the citizens of the Borough of Girardville.

133. Plaintiff was terminated for reporting and opposing wrongful conduct including the wrongful conduct of Mayor Judith Mehlbaum, who repeatedly used her office in order to subject citizens that she did not like to violations of their civil rights.

134. Mayor Judith Mehlbaum acted with willful disregard for the law in her official capacity as Mayor of the Borough of Girardville.

135. Judith L. Mehlbaum also acted outside her official capacity when she attempted to use the Borough of Girardville Police Department like her own private security team.

136. Plaintiff was terminated because he refused to go along with the illegal requests of Judith L. Mehlbaum.

137. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer a loss of income, loss of salary, bonuses, benefits and other compensation which such employment entails.

138.    Plaintiff also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

139.    Plaintiff has further experienced severe emotional and physical distress.

140.    As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages as against all the Defendants, jointly and severally.

141.    Plaintiff was subjected to adverse employment actions including being denied pay raises and promotions, having other changes to the terms and conditions of Plaintiff's employment.

142.    Pursuant to Plaintiff engaging in protected activity, Plaintiff was subjected to unlawful termination from employment.

143.    These are just examples of the unlawful conduct to which Plaintiff was subjected by Defendants.

144.    As a result of Defendants' conduct, Plaintiff was caused to sustain serious and permanent personal injuries, including permanent psychological injuries.

145.    As a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.

146.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer a loss of income, loss of salary, bonuses, benefits and other compensation which such employment entails.

147.    Plaintiff also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

148.    Plaintiff has further experienced severe emotional and physical distress.

**COUNT I**
**42 U.S.C. §1983**
**VIOLATIONS OF EQUAL PROTECTION CLAUSE, FIRST, FOURTH, FIFTH AND**
**FOURTEETH AMENDMENTS AND STATUTES INCLUDING SECTION 1981 AND**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**(against all named Defendants)**

149.    Plaintiff hereby incorporates all allegations contained in the paragraphs above and

repeats and realleges each and every allegation made in the above paragraphs of this complaint

150.    42 U.S.C. Section 1983 stated:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

151.    Defendants and their employees and agents violated Plaintiff's rights under the First, Fourth,

Fifth, and Fourteenth amendments  including violations of the equal protections clause and violations of

Plaintiff's due process rights and substantive rights.

152.    Defendants violated Plaintiff's rights under Title VII of the Civil Rights Act of 19

153.    Defendants violated Plaintiff's rights under Section 1981.

154.    Defendants acted under color of state law to violate the plaintiff's rights to equal protection

and due process of law.

155.    Plaintiff was a public employee and Plaintiff never received a <u>Loudermill</u> Hearing prior to

his unlawful suspension without pay and termination.

156. A "Loudermill" hearing is part of the "due process" requirement that must be provided to a public employee prior to removing or impacting the employment property right (e.g. imposing severe discipline).

157. The purpose of a "Loudermill hearing" is to provide an employee an opportunity to present their side of the story before the employer decides on discipline.

158. Prior to the hearing, the employee must be given a Loudermill letter–i.e. specific written notice of the charges and an explanation of the employer's evidence so that the employee can provide a meaningful response and an opportunity to correct factual mistakes in the investigation and to address the type of discipline being considered.

159. Defendants' unlawful actions were done with the specific intent to deprive both Plaintiffs of their constitutional right to be free from unreasonable seizer and to enjoy equal protection under the laws.

160. Defendants acting under color of state law acted to intentionally violate Plaintiff's rights afforded by the United States Constitution and the rights afforded the laws derived from the rights afforded by the United States Constitution.

161. Defendants also violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964 through discrimination and retaliation for reporting said discrimination.

162. Defendants are liable to Plaintiff for the damages caused by the violations of Plaintiff's rights as set forth in more detail below.

163. Plaintiff were subjected to equal protection violations and violations of his substantive rights under the First and Fourteenth Amendments by each and every Defendant named above, who acting under color of state law deprived Plaintiffs of their constitutional and statutory rights and rights.

164. The Borough of Girardville is a public entity as a local government that maintained a policies and customs that caused Plaintiffs constitutional violations.

165. Defendants maintained a policy and custom of using the Borough of Girardville Police Department to subject private citizens of violations of their constitutional rights.

166. Defendants maintained a policy and custom of refusing to act in accordance with the laws and with Defendants' own so-called written policies.

167. Defendants' policies and customs is to protect the harasser and subject individuals who engage in protected activity to retaliation.

168. Each individual Defendants identified within this complaint worked in accordance with this policy and custom in order to protect the harasser.

169. Plaintiffs' constitutional rights were violated as a direct result of Defendants' policy and custom which led to Plaintiffs being subjected to disparate treatment, hostile work environment and retaliation.

170. Defendants have a long-standing policy and custom of ignoring the laws of the Commonwealth of Pennsylvania when it suits Defendants to do so.

171. Defendants have repeatedly ignored their own State's laws, and their own City's so-called written policies, procedures and protocols.

172. Defendants have ignored the laws of the Commonwealth of Pennsylvania.

173. Plaintiffs' lawsuit is not time-barred because every act and occurrence that forms the basis of Plaintiffs' lawsuit is either part of a continuing violation that may have begun prior to July 2021, but continued past July 2021.

174. Moreover, the adverse actions and constitutional violations which form the basis of Plaintiffs' lawsuit occurred between July 2021 and the present.

175. The policies and customs that Defendants maintain and have enforced to silence the Plaintiffs and subject Plaintiffs to a deprivation of their constitutional and statutory rights are

still being implemented today and Plaintiff's continue to suffer these violations at the hands of the individual Defendants and at the hands of the Commonwealth of Pennsylvania.

**COUNT II**
**43 P.S. § 1423**
**PENNSYLVANIA WHISTLEBLOWER RETALIATION**
**(All Defendants)**

176.    Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

177.    The PWL provides, "No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act." 43 P.S. § 1423(a).

178.    "Wrongdoing includes not only violations of statutes or regulations that are of the type that the employer is charged to enforce, but violations of any federal or state statute or regulation." Golaschevsky v. Dep't of Envtl. Protection, 554 Pa. 157, 162 (1998) citing 43 P.S. § 1422.

179.    In order to make out a retaliation case under the PWL, a plaintiff must plead: (1) wrongdoing and (2) a causal connection between the report of wrongdoing and adverse employment action. McAndrew v. Bucks County Bd. Of Com'rs, 982 F. Supp. 2d 491, 503 (E.D. Pa. 2013).

180.    In analyzing whether the motive for an adverse employment action is retaliatory, courts have looked at two factors: "(1) the temporal proximity between the protected activity and

the alleged discrimination and (2) the existence of a pattern of antagonism in the intervening period." Hussein v. UPMC Mercy Hosp., 466 Fed.Appx. 108, 112 (3d Cir. 2012).

181. Plaintiff reasonably believed when he reported issues related to fraud and abuse through the intentional violation of Plaintiff's rights along with the civil rights of the citizens of the Borough of Girardville.

182. Plaintiff engaged in protected activity several times in the months leading to the unlawful suspension and termination from employment.

183. Plaintiff reasonably believed that his reports of abuse and wrongdoing and other issues related to the civil rights violations of citizens of the Borough of Girardville constituted wrongdoing.

184. Plaintiff believed and reported that the Mayor of Girardville, Judith L. Mehlbaum was using the Borough of Girardville Police department like her own private security force by sending officers to the homes of the citizens and harassing them in violation of their constitutional rights.

185. Plaintiff "blew the whistle" when he reported these violations directly to his supervisors including to Mayor Judith L. Mehlbaum.

186. Plaintiff blew the whistle by opposing and reporting police misconduct and wrongdoing.

187. Defendants retaliated against Plaintiff by with knowledge of the wrongful activity in violation of PWL.

188. Plaintiff will rely on a broad array of evidence to demonstrate a causal link between his protected activity and Defendants' actions taken against him, such as the unusually suggestive proximity in time between his good faith report and his termination.

189.    There is also extensive video footage of all of the incidents reported by Plaintiff as the officers all wore police body cameras.

190.    Plaintiff will also show through circumstantial evidence by the way in which similarly situated coworkers who did not engage in protected activity were treated.

191.    As a result of Defendants' violations of the PWL, Plaintiff has suffered damages, including, but not limited to past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**WHEREFORE** Plaintiff demands judgment against Defendants in excess of $50,000.00 for actual damages, compensatory damages, punitive damages, back pay, front pay, reinstatement, attorneys' fees, litigation costs, pre- and post-judgment interest; as well as an adjudication and declaration that Defendants' conduct as set forth herein is in violation of the PWL.

### COUNT II
### WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY
(All Defendants)

192.    Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

193.    In Geary v. U.S. Steel Corp., the Pennsylvania Supreme Court recognized a narrow exception to the employment at-will doctrine, holding that an at-will employee can maintain a wrongful discharge action where the termination violated a clear mandate of public policy. 456 Pa. 171 (1974).

194.    A plaintiff may maintain a wrongful discharge claim under three circumstances: (1) an employer requires an employee to commit a crime, (2) prevents an employee from complying

with a statutorily-imposed duty, or (3) discharges the employee in violation of a statute prohibiting discharge, or where the termination violates a public policy that is "'so obviously for or against public health, safety, morals, or welfare that there is a virtual unanimity of opinion in regard to it.'" Stewart v. FedEx Express, 114 A.3d 424, 427-28 (Pa. Super. Ct. 2015) (citing and quoting Mikhail v. Pa. Organization for Women in Early Recovery, 63 A.3d 313, 316–17 (Pa. Super. Ct. 2013)).

195.    Here, Defendants discharged Plaintiff in violation of the Pennsylvania Whistleblower Law, which is a statute prohibiting discharge where it prohibits employers from retaliating and discharging an employee because the employee made a good faith report of an instance of wrongdoing to his employer. Stewart, 114 A.3d at 428 (citation omitted); see also Denton v. Silver Stream Nursing & Rehab. Ctr., 739 A.2d 571, 577 (Pa. Super. Ct. 1999) (holding that claim under Whistleblower Law falls under the public policy exception to the at-will employment rule).

196.    Accordingly, Defendants' termination of Plaintiff was wrongful and violated a public policy.

197.    As a result of Defendants' wrongful conduct, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**WHEREFORE** Plaintiff demands judgment against Defendants in excess of $50,000.00 for actual damages, compensatory damages, punitive damages, back pay, front pay, reinstatement, attorneys' fees, litigation costs, pre- and post-judgment interest; as well as an adjudication and declaration that Defendants' conduct as set forth herein is in violation of the PWL.

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, including but not limited to all actual damages for physical injuries caused to Plaintiff, compensatory damages, emotional distress and punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

**DEREK SMITH LAW GROUP, PLLC**

By: _____/s/ Seth D. Carson_____
      Seth D. Carson
      1835 Market Street
      Suite 2950
      Philadelphia, Pennsylvania 19103
      (215) 391-4790
      *Attorney for Plaintiff, Fabrizio Bivona*

DATED: July 10, 2023